UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | |
|---|---|
| NAOMI CHIAL, | Case No. 07-CV-0123 (PJS/RLE) |
| Plaintiff, | |
| v. | ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |
| SPRINT/UNITED MANAGEMENT COMPANY, | |
| Defendant. | |

---

Jill Clark, JILL CLARK, P.A., for plaintiff.

Cynthia P. Arends, Sandra L. Jezierski, and Katie M. Connolly, HALLELAND LEWIS NILAN & JOHNSON, P.A., for defendant.

Plaintiff Naomi Chial brings statutory and common-law whistleblower claims, as well as a defamation claim, against her former employer, defendant Sprint/United Management Company ("Sprint"). This matter is before the Court on Sprint's motion for summary judgment. For the reasons set forth below, the motion is granted.

I.  BACKGROUND

Sprint is a telecommunications company that sells mobile phones and service contracts. During the time period relevant to this action, Chial was employed by Sprint as a retail sales manager. Chial managed multiple stores in the Twin Cities area; the store manager at each of the stores reported directly to her. Chial, in turn, reported to an area retail director. Beginning in 2001, the area retail director for the Twin Cities market, and thus Chial's immediate supervisor, was Michele Dunn.

Sprint sales representatives were compensated by commission, and both Chial's and Dunn's compensation depended in part on the commissions earned by the sales representatives

over whom they had ultimate authority. Sprint assigned a value to each sale called the "monthly recurring charge," or MRC. As one would expect from the name, MRC essentially referred to the charges that customers incurred each month under their Sprint plans. Thus, for example, if a sales representative sold a plan to a customer that obligated the customer to pay $50 per month, that sale's MRC was $50, and the salesperson earned a one-time commission on that $50. (The sales representative did not earn commissions on the continuing monthly revenue generated by that sale; Sprint paid a commission only at the time of the initial sale. Chial Dep. 301.)

In March or April of 2004, Chial participated in a telephone meeting involving her store managers and Jeff Lively, a retail sales manager who apparently had special expertise regarding Sprint's compensation policies. Chial Dep. 160.[1] During the course of the meeting, one of Chial's store managers asked Lively for advice about how to increase MRC (and thus commissions). In response, Lively recommended a method for reporting sales under Sprint's "add-a-phone" program. Under that program, a Sprint customer could add another phone to an existing plan for less than the cost of a new plan. For example, an existing customer with a $50-per-month plan might add a second phone to her plan for an additional $10 per month.

It was Chial's understanding that the MRC on such a sale, and thus the basis of the sales representative's commission, would be limited to the $10 generated by adding the new phone. But Lively explained that it was possible to increase MRC by recording the addition of the new phone not under the "add-a-phone" program, but rather as a sale of a new primary account. The existing customer would then be added to the new primary account under the cheaper "add-a-

---

[1]Although page 160 of Chial's deposition indicates that this phone call, and the events stemming from it, took place in 2003, there is no dispute that the relevant events actually took place in 2004. Chial Dep. 175.

phone" program. By recording the sale in this manner, the MRC would include the value of the "new" primary account and the salesperson would earn a higher commission, despite the fact that the salesperson had not truly opened a new primary account. Moreover, this practice would not harm the customer, as she would pay the same monthly charge ($60, in this example) regardless of whether she was identified as the primary account or the secondary account. For simplicity's sake, the Court will refer to the practice of switching the primary and secondary customers to generate a higher MRC as the "Lively practice."

After Lively explained this practice, Chial objected to it as "commissions fraud" — that is, as fraud on Sprint — and informed Lively that she would not permit her sales representatives to engage in it unless she received written approval from upper management. Chial Dep. 177-78, 305; Chial Decl. § IV. Shortly thereafter, Chial contacted Dunn, her manager, to report her concerns about the Lively practice. Chial Dep. 160. Dunn told Chial that she would look into it.[2] Chial Dep. 172. Dunn passed on Chial's concerns to Dennis Armstrong, a finance manager at Sprint's headquarters. Dunn Dep. 40-41.

In an attempt to address Chial's concerns, Lively sought input from other Sprint managers about the practice, collected some of the e-mails that he received, and forwarded them to Chial. Clark Decl. Ex. E. In one of the e-mails forwarded to Chial, Lively stated that he did not think the practice presented any problems because it had no effect on the customer (although Lively also stated that, when a customer is adding a phone to a high-end plan, "we agreed on the

---

[2]In her brief, Chial claims that she told Dunn that she would not engage in the Lively practice. Pl.'s Mem. Opp. Summ. J. 8. But Chial did not so testify, and Dunn's testimony is equivocal. *See* Dunn Dep. 106-08. For purposes of Sprint's motion, however, the Court will accept Chial's assertion as true.

call [with Chial and her store managers] this seemed like commissions fraud??"). *Id.* Chial responded that she thought the practice would cause customer confusion. *Id.* Eventually, Armstrong joined the e-mail discussion and stated his opinion that the practice was commissions fraud. *Id.* Later, Armstrong contacted Chial on the phone to discuss the issue and reiterated his belief that the practice was fraudulent. Chial Dep. 179-81, 306; Chial Decl. § IV. Ultimately (in October 2004), Sprint amended its policies to explicitly bar the Lively practice (except in certain specified circumstances) and altered its compensation formula so that the practice would not be economically attractive to sales representatives. Chial Dep. Ex. 63 at 11-12 (Sprint's October 2004 Master Compensation Guide restricting the Lively practice); Brocket Dep. 58-59 (Sprint revised its compensation policies in 2004 to include more services in the calculation of MRC).

In May 2004, shortly after Chial had reported the Lively practice to Dunn, Dunn gave Chial a verbal warning for poor performance. Chial Dep. 198. Chial was surprised, as she had worked with Dunn for several years and had never received such a warning before. At Chial's request, Dunn provided a written summary of the warning. *See* Arends Aff. Ex. E at SPR001573. The warning described various ways in which Chial was allegedly failing to meet Sprint's expectations with respect to Sprint procedures and operations. *Id.* In early July 2004, Dunn issued a formal written warning to Chial. Arends Ex. E at SPR001356. As a result of the stress caused by these warnings, Chial took FMLA leave from July through October. Chial Dep. 167. Shortly after Chial returned to work in the latter half of October, Dunn gave Chial another written warning. Dunn Dep. 149-50; Arends Aff. Ex. E at SPR000950. At the end of

November, Chial was given a "final warning." Arends Aff. Ex. E at SPR000954. Chial was terminated in January 2005. Chial Dep. 206.

## II. ANALYSIS

### A. *Standard of Review*

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A dispute over a fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a fact is "genuine" only if the evidence is such that a reasonable jury could return a verdict for either party. *Ohio Cas. Ins. Co. v. Union Pac. R.R.*, 469 F.3d 1158, 1162 (8th Cir. 2006). In considering a motion for summary judgment, a court "must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the non-moving party." *Winthrop Res. Corp. v. Eaton Hydraulics, Inc.*, 361 F.3d 465, 468 (8th Cir. 2004).

### B. *The Whistleblower Act*

Minnesota's Whistleblower Act states, in relevant part:

> An employer shall not discharge, discipline, threaten, otherwise discriminate against, or penalize an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because:
>
> (a)   the employee, or a person acting on behalf of an employee, in good faith, reports a violation or suspected violation of any federal or state law or rule adopted pursuant to law to an employer or to any governmental body or law enforcement official;

        [or] . . .

  (c)    the employee refuses an employer's order to perform an action that the employee has an objective basis in fact to believe violates any state or federal law or rule or regulation adopted pursuant to law, and the employee informs the employer that the order is being refused for that reason[.]

Minn. Stat. § 181.932, subd. 1.

Minnesota courts apply the three-step *McDonnell Douglas* framework in analyzing claims under the Whistleblower Act. To establish a prima facie whistleblower claim, an employee must show that (1) she engaged in statutorily protected conduct; (2) she suffered an adverse employment action; and (3) there was a causal connection between the two. *Rothmeier v. Inv. Advisers, Inc.*, 556 N.W.2d 590, 592 (Minn. Ct. App. 1996). The burden of production then shifts to the employer to articulate a legitimate, non-retaliatory reason for the adverse employment action. *Id.* Finally, the employee may demonstrate that the employer's stated reason is pretextual. *Id.*

To establish that she engaged in statutorily protected conduct, Chial must first show that she reported a violation or suspected violation of the law to Sprint. Chial did not need to identify the specific law that she believed was being violated. She needed only to allege facts that, if true, would have violated the law. *Abraham v. County of Hennepin*, 639 N.W.2d 342, 355 (Minn. 2002).

The Court has little trouble concluding that Chial reported a violation or suspected violation of the law. The Lively practice appears to constitute theft under Minn. Stat. § 609.52 subd. 2(3) (theft by false representation) and (4) (theft by swindling). After all, under the Lively

practice, a sales representative lied about who was the primary customer and who was the secondary customer, and did so to induce Sprint to pay commissions that the sales representative had not earned.

But a report of a violation or suspected violation of law is not sufficient to establish that an employee engaged in conduct protected by the Whistleblower Act.  Rather, the employee must subjectively believe that the conduct that she is reporting is unlawful (and not just unethical or unfair), and the employee must be reporting the conduct *because* the conduct is illegal (and not for some other purpose, such as because the conduct is hurting her company's image, or because employees who are willing to engage in the conduct have an unfair advantage over employees who are not).  As the Minnesota Supreme Court has written:

> Under the whistle-blower statute, establishing that an employee reported violations or suspected violations of law to his or her employer does not end the inquiry.  The critical question of whether those reports were made in good faith must also be answered.  In order to determine whether a report of a violation or suspected violation of law is made in good faith, we must look not only at the content of the report, but also at the reporter's purpose in making the report.  The central question is whether the reports were made for the purpose of blowing the whistle, i.e., to expose an illegality.

*Obst v. Microtron, Inc.*, 614 N.W.2d 196, 202 (Minn. 2000).  In analyzing the good-faith requirement, courts look to the employee's real purpose — what was actually on her mind — at the time the report was made.  *Id.*

Ordinarily, whether an employee made a report in good faith is a question of fact. *Buytendorp v. Extendicare Health Servs., Inc.*, 498 F.3d 826, 834 (8th Cir. 2007).  In this case, however, Chial herself admitted that, at the time she made her report, she did *not* believe that the Lively practice violated the law:

-7-

>   Q:   At the time you made the complaint did you believe that it
>        was a violation of either state or federal law?
>
>   A:   No.

Chial Dep. 296. That is about as clear as testimony gets. Because Chial did not believe that the Lively practice was illegal at the time she made her report, she could not possibly have made the report for the purpose of exposing an illegality. Her whistleblower claim must therefore fail.

Chial attempts to avoid her fatal admission by pointing to other testimony in which she calls the Lively practice "unethical," "just wrong," and "commissions fraud," and in which she equates "commissions fraud" with theft. *See, e.g.*, Chial Dep. 167-68, 175, 296, 305, 307-09.[3] As noted, though, it is not sufficient for an employee to believe that conduct is "unethical" or "just wrong"; she must believe that it is illegal, she must hold that belief at the time she reports the conduct, and she must report the conduct *because* it is illegal. None of this is true with respect to Chial's reporting the Lively practice to Dunn.

With respect to Chial's characterization of the Lively practice as "commissions fraud": It is clear that Chial *now* equates commissions fraud with theft. Chial Dep. 296 ("Q. Do you know — did you know for sure whether commissions fraud was also criminal conduct? A. I would think it would be. It's theft."). There is also evidence that, as a result of her conversation with Armstrong (the Sprint finance manager), Chial came to believe that the Lively practice was illegal. Chial Dep. 306-07. But Chial's later beliefs are not relevant; the crucial question is whether she believed the Lively practice was illegal *when she reported it to Dunn*. As to that

---

[3] Chial also speculated that the Lively practice artificially inflated Sprint's reported revenue. Chial Dep. 165-57, 312-14. Chial admitted, however, that she was unaware of any potential problem with Sprint's financial statements until several months after she made her report to Dunn. Chial Dep. 165-67.

question, Chial's testimony is crystal clear: She did not believe the Lively practice was illegal. Chial Dep. 296.

Chial also argues, in the alternative, that she refused to participate in illegal conduct, thus giving rise to a claim under subdivision 1(c) of the Whistleblower Act. The basis of this claim is unclear. Presumably, Chial is referring to her statements to Lively and Dunn that she would not allow her salespeople to engage in the Lively practice. But in order to maintain a claim under subdivision 1(c), Chial must have "refuse[d] an employer's order to perform an action . . . ." Chial was never *ordered* to implement the Lively practice. Lively (who had the same rank within Sprint as Chial) merely gave advice in responding to a question — and he gave that advice not to Chial, but to her sales representatives. As far as the record shows, those who did outrank Chial — including Dunn and Armstrong — did not order her to implement the Lively practice. To the contrary, they *agreed* with Chial that the practice was wrong, and Sprint eventually banned the practice. *See Skare v. Extendicare Health Servs., Inc.*, 515 F.3d 836, 841-42 (8th Cir. 2008) (plaintiff failed to establish a prima facie case under subdivision 1(c) of the Whistleblower Act because she presented no facts showing that she disobeyed an order from her employer).

Moreover, even if Chial had refused an order to implement the Lively practice, her motivation for doing so must have been that she had an "objective basis in fact" to believe that the practice violated the law, and she must have told Sprint that she was refusing its order for that reason. Minn. Stat. § 181.932, subd. 1(c). Given that Chial did not believe that the Lively practice was illegal at the time that she reported it to Sprint, she obviously did not inform Lively

-9-

or Dunn or anyone else that she believed the practice was illegal.  Sprint's motion for summary judgment is therefore granted on Chial's claims under the Whistleblower Act.

### C.  Common-Law Retaliation Claim

Chial also brings a common-law retaliation claim under *Phipps v. Clark Oil & Refining Corporation*, 408 N.W.2d 569 (Minn. 1987).  In *Phipps*, the Minnesota Supreme Court held that an employee may bring an action for wrongful discharge if the employee is "discharged for refusing to participate in an activity that the employee, in good faith, believes violates any state or federal law or rule or regulation adopted pursuant to law."  *Id.* at 571.

Sprint argues that the Whistleblower Act preempts the common-law claim recognized in *Phipps*.  This argument is curious, as the Minnesota Supreme Court squarely held to the contrary in *Nelson v. Productive Alternatives, Inc.*, 715 N.W.2d 452, 455-56 (Minn. 2006).  Nevertheless, like her statutory claim, Chial's common-law claim fails on the merits.  Chial did not refuse to participate in the Lively practice on the basis of any good-faith belief that the practice was illegal; again, she did not *believe* that the practice was illegal until after she spoke to Lively and Dunn.  Chial thus cannot maintain a claim under *Phipps*, and Sprint's motion for summary judgment on Chial's common-law claim is granted.

### D.  Defamation

A statement is defamatory if (1) it is false, (2) it is communicated to another, and (3) it tends to harm the plaintiff's reputation.  *Stuempges v. Parke, Davis & Co.*, 297 N.W.2d 252, 255 (Minn. 1980).

The basis of Chial's defamation claim is that she was compelled to tell prospective employers that she was terminated for poor performance, which she contends is false.  It is true,

-10-

as Chial argues, that Minnesota recognizes the doctrine of compelled self-publication: "[I]n an action for defamation, the publication requirement may be satisfied where the plaintiff was compelled to publish a defamatory statement to a third person if it was foreseeable to the defendant that the plaintiff would be so compelled." *Lewis v. Equitable Life Assurance Soc'y of the U.S.*, 389 N.W.2d 876, 888 (Minn. 1986). It is also true, as Chial further argues, that "false statements about a person's business, trade, or professional conduct" are defamatory per se and damages are therefore presumed. *Becker v. Alloy Hardfacing & Eng'g Co.*, 401 N.W.2d 655, 661 (Minn. 1987).

The problem with Chial's defamation claim is that she has never identified to whom she published the allegedly defamatory statements with anything like the degree of specificity required. Under Minnesota law, a plaintiff seeking to recover for defamation must, at a minimum, identify who made the allegedly defamatory statements, to whom they were made, and when. *Pope v. ESA Servs., Inc.*, 406 F.3d 1001, 1011-12 (8th Cir. 2005); *Rouse v. Dunkley & Bennett, P.A.*, 520 N.W.2d 406, 411 (Minn. 1994); *Wikstrom v. Little Earth of United Tribes Hous. Corp.*, No. A06-1023, 2007 WL 1746908, at *4 (Minn. Ct. App. June 19, 2007).

The closest Chial comes to identifying the recipients of the allegedly defamatory statements is in her answers to interrogatories, in which she provides a list of employers to whom she submitted resumes or applications. Clark Decl. Ex. F at 7-9. But that list does not distinguish this case from *Rouse*. In *Rouse*, the plaintiff identified thirteen companies where he interviewed and provided a few further details, such as the locations of some of the companies and whether he interviewed with a man or a woman. *Rouse*, 520 N.W.2d at 411. The Minnesota Supreme Court held that this evidence was insufficient to create an issue of fact with respect to

whether the plaintiff was compelled to publish the allegedly defamatory reasons for his termination. *Id.* The court specifically noted the plaintiff's failure to provide the names of the interviewers and the lack of any documentary evidence that the plaintiff applied for the positions, submitted resumes, or received rejections. *Id.* Similarly, Chial has simply provided a list of employers to whom she applied without any further identifying information. Chial has also not provided any documentary evidence of her applications. Chial has thus failed to create a genuine issue of fact as to publication, and summary judgment on her defamation claim is therefore appropriate.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1. Defendant's motion for summary judgment [Docket No. 11] is GRANTED.

2. Plaintiff's complaint [Docket No. 1-2] is DISMISSED WITH PREJUDICE AND ON THE MERITS.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: April 1, 2008                                s/Patrick J. Schiltz
                                                    Patrick J. Schiltz
                                                    United States District Judge